## INTERNATIONAL HARVESTER CO. OF AMERICA v. RIEKE.

(Circuit Court of Appeals, Eighth Circuit. November 10, 1925.)

No. 7007.

1. **Principal and agent** &cong;148(4)—**Buyer of truck held not entitled to recover against seller for false representations by local sales agent.**

Seller of motor truck is not liable for false representations of local sales agent, guaranteeing profitable work where prior to purchase seller's credit agent warned purchaser that sales agents were not authorized to make such promises.

2. **Principal and agent** &cong;148(4)—**Transaction not subject to attack because of representations which complaining party knew were made without authority, and on which he did not rely.**

Sale is not subject to attack because of representations which complaining party knew were made without authority, and on which he did not rely.

3. **Principal and agent** &cong;193—**Evidence of warning to purchaser of truck that seller was not bound by representations of local sales agent held to warrant instruction of verdict for defendant.**

In action by buyer of truck against seller for fraudulent representations, undisputed evidence that credit agent of seller warned buyer, before purchasing truck, that seller was not responsible for statements and representations of local sales agent as to ability to find work with truck, *held* sufficient to have warranted instructing verdict for defendant.

4. **Fraud** &cong;35—**Fraud held waived by buyer of truck trading it for new one.**

Where owner of truck about to be traded in for new one was warned before making trade by credit agent of seller that representations of local sales agent as to ability to find work with truck were not binding on seller, his trading truck for new one was complete waiver and condonement of alleged fraud inducing him to purchase first truck and prohibited recovery thereon, even on theory that he relied on such representations in purchase of new truck.

5. **Fraud** &cong;64(1)—**Overruling motion to direct verdict held error.**

In action against seller of motor truck for fraudulent representations, where evidence as to waiver by plaintiff of alleged fraudulent representations was such that trial court, in exercise of sound judicial discretion, should not have sustained verdict for plaintiff, overruling motion at close of testimony to direct motion for defendant was error.

In Error to the District Court of the United States for the District of Colorado; J. Foster Symes, Judge.

Action by Raymond E. Rieke against the International Harvester Company of America, commenced in a state court of Colorado and removed to the District Court of the United States for the District of Colorado. Judgment for plaintiff, and defendant brings error. Reversed and remanded.

Frank L. Grant, of Denver, Colo., for plaintiff in error.

W. R. Ramsey, of Denver, Colo., for defendant in error.

Before LEWIS and KENYON, Circuit Judges, and MUNGER, District Judge.

KENYON, Circuit Judge. [1] This case was commenced in a state court of Colorado and removed to the District Court of the United States for the District of Colorado. Defendant in error sought damages from the International Harvester Company of America, alleging that on the 19th day of August, 1922, he purchased from it through its agents one International truck, model No. 61 (referred to hereinafter as model No. 61), and that he was induced to purchase the same by the false and fraudulent representations of such agents; that said representations were agreements to furnish him work on a federal aid highway construction project near Canon City, Colo., for a period of 90 days at a compensation of $40 per day, and thereafter to furnish him further work; that the work was ready for him when said truck was purchased; that he agreed to pay for said truck the sum of $3,469.30, $300 to be paid in cash and the balance in notes; further that he was given credit by plaintiff in error for the sum of $900, the purchase price of a truck he had theretofore purchased from it, being International truck, model No. 41 (hereinafter referred to as model No. 41). The complaint alleges that plaintiff in error did not furnish defendant in error the work agreed upon, and therefore he was unable to make the $40 per day promised for the period of 90 days, or for any other period; that he was compelled thereafter to incur additional expense for a new body and equipment for the truck; that as an inducement to incur said additional expense plaintiff in error proposed to give him work on highway construction at or near Brighton, Colo.; that the situation was in general misrepresented to him, and that he did not know such representations were false until about the 7th of September, 1922, at which time he demanded of plaintiff in error the return of the purchase money, the cancellation of the notes, and the return of model No. 41; that he endeavored to return to plaintiff in error model No. 61.

Plaintiff in error in its answer admits the sale of model No. 61; denies any representations, further than those contained in the written warranty; denies that any parties had the right to make representations as to furnishing work, and, further, that before model No. 61 was delivered defendant in error was fully advised that the parties claimed to have made the alleged fraudulent representations as to furnishing work had no authority so to do; that in consideration of extended terms granted defendant in error he signed and delivered to plaintiff in error the following statement, which is in evidence:

"Defendant's Exhibit D.

"International Harvester Company of America (Incorporated).

"Farm Operating Equipment.

"McCormick.                    International.

"Deering.

"Harvester Machines.
"Hay and Corn Machines.
"Tillage Implements.
"Seeding Machines.
"Plows.
"Threshers.
"Binder Twine.
"Motor Trucks.
"Oil Tractors.
"Oil Engines.
"Cream Separators.
"Manure Spreaders.
"Farm Wagons.
"Feed Grinders.

"2308–26 15th St. Denver, Colo.,
                    "September 20, 1922.

"Denver Branch:
    "W. J. Pilant, Manager.
    "G. C. Marsh, Asst. Manager,
            "For Mr.
            "Your Letter
            "Subject

"In consideration of the extended terms and for the added equipment in the purchase of an International model 61 truck for which I have executed notes, I wish to state that I am absolutely satisfied with the deal as it now stands, and that I waive any and all promises, either verbal or in writing, which have been made to me by any of the salesmen or any other representatives of the International Harvester Company, and I unconditionally release and relinquish any and all claims against said Harvester Company arising out of the purchase of said truck.

"This agreement has been signed by me before the truck has been delivered and the agreement is part of the consideration for the delivery of the truck.

                "[Signed]   Raymond Rieke.
    "Witness:  [Signed]   C. F. Jackson.
    "Address reply to the company at branch address above.

"Mention name of writer and the date of this letter."

Motions for a directed verdict in favor of plaintiff in error were made at the close of defendant in error's testimony, and also at the close of all the testimony. Said motions were denied. The jury returned a verdict in favor of defendant in error in the sum

of $760, and a judgment was duly entered on the verdict.

A number of questions are raised by the assignments of error, the important ones being: (a) Were the alleged fraudulent representations merely such promises to do something in the future as would be insufficient to base thereon an action for deceit, or should the action properly be one for breach of contract? (b) Did defendant in error prior to entering into the contract for the purchase of model No. 61 have full knowledge that the alleged false representations were made by parties having no authority to bind plaintiff in error thereby, and with such knowledge, did he enter into and carry out the contract and thus waive the alleged fraud?

There may be doubt as to the first proposition, and we find no necessity for passing on the same, as a correct answer to the second is in our judgment decisive of the case presented by the record. This suit is not for deceit and fraud in inducing defendant in error to enter into the contract for the purchase of model No. 41 (the two-ton truck), but is confined entirely in the complaint filed to matters entering into the purchase of model No. 61 (the three-ton truck). We review somewhat in detail the evidence. In the Denver Post of August 9, 1922, appeared the following advertisement:

### "Truck Hauling

"Money-making job that will pay for a truck, give you a good living, and save money. Man that can invest $1,189 can find a real opportunity here with a firm that has a 90 year old reputation of square dealing. We investigated this work thoroughly and found an average earning of $24 per day, counting rainy days and all delays, and the work will take from a year to 18 months to finish. Out-of-town inquiries telephone please, as this will be gone shortly.

### "International Harvester Co.
### "2308 15th 'St."

After reading this defendant in error went to the office of the International Harvester Company, and he testifies that one Hewitt, of Hewitt & Doss (who seem to have been agents selling upon commission and handling the matter referred to in the advertisement), represented to him that if he purchased one of plaintiff in error's trucks he would have a job on road work "out to Brighton" with a daily wage of $24, which would last from a year to 18 months, and that he would be working for the International Harvester Company. He then entered into a contract for the purchase of model No. 41, claiming that he did so because the supposed job went with the sale of the truck. He turned in a car, which plaintiff in error took as a $600 credit, paid $300 in cash, and gave notes for the balance. He received this car about the 15th of August, 1922, and went to the place where the work was supposed to be. The matter did not prove satisfactory, and he returned to Denver; had a conference with Hewitt, and told him he could not make any money on the job, and Hewitt said he knew it was not very good. He then negotiated with Hewitt with reference to trading in model No. 41 for a larger truck, viz. model No. 61, and claims that Hewitt promised him he was to have a job paying from $40 to $70 a day at Canon City doing certain work with the truck, and that it would last ninety days, after which time he would have other work for him. These are the alleged false representations set forth in the complaint and relied on in this case.

Defendant in error signed a written order for said model No. 61 August 19, 1922, which was accepted by plaintiff in error September 2, 1922; said order reciting that the truck was sold under the regular warranty given by the International Harvester Company of America as printed on the back thereof, and no others. After defendant in error had made the arrangement for model No. 61 he went to Canon City and worked on the job for four days, but was unable to make more than $15 a day. The contractor, Mr. Allen, became dissatisfied, and decided he could not afford to run the steam shovel for the two trucks employed, and as a result defendant in error was again out of a job. He returned to Denver, saw Hewitt, and was told by him that the Brighton job was "going good now"; that if he would go out there with a three-ton truck he could make money. He went and looked the matter over, but was dissatisfied with the body of his truck, and returned to Denver again, and arranged with Mr. Hancock, of the International Harvester Company, for a body with a hydraulic hoist for the truck. Before this was delivered, Exhibit D (heretofore set forth) was signed by defendant in error. Mr. Jackson, credit manager of the International Harvester Company, testified that he passed on the credit for model No. 61, and that he had had a talk with defendant in error concerning the entire matter. This testimony being of great importance, we quote therefrom the following:

"Well, it was a question of extending him further credit. We had sold him a two-ton, or a model 41, and he was dissatisfied with the capacity of it, and he asked to trade it back and get a larger truck. I told him that we couldn't extend him any further credit. Then he talked about some promise that had been made him by Hewitt & Doss in regard to the earning capacity of the 41, and finally concluded to exchange with him and sell him a model 61, and before the 61 was delivered to him, before I accepted the order, I asked him positively whether or not there had been any promise made in regard to guaranteeing him work with the 61, and he said there had been, and I asked him who had made it, and he said Hewitt & Doss, and I told him then positively that Hewitt & Doss had absolutely no authority to make any arrangements for the International Harvester Company, * * * and that if he took the 61, he must take it with the distinct understanding that there was no promise as to the earnings or guarantee of work, as far as the International Harvester Company was concerned, but any private arrangement he had with Hewitt & Doss I had nothing to do with.

"Q. That was before the truck was delivered? A. That was before the 61 was delivered. The 41 had been delivered, the two-ton truck.

"Q. Well, he returned the two-ton truck? A. He returned the two-ton truck before the 61 was delivered.

"Q. And was given credit? A. Yes, sir; we credited him. We traded.

"Q. What capacity is the 61 truck you refer to? A. It is a three-ton.

"Q. And the 41 a two-ton? A. Two-ton; yes, sir.

"Q. I show you paper identified as Defendant's Exhibit D. A. Yes, sir; that is the agreement Mr. Rieke signed when we delivered him the model 61."

Defendant in error took the stand in rebuttal, but made no denial of this testimony, and it stands undisputed in the record. Hence the situation under this record is that before defendant in error purchased model No. 61 he knew that any promises with reference to guaranteeing work with the purchase of model No. 61 were made by parties having no authority so to do, and that if he took model No. 61 he must do so with the understanding that there were no promises on the part of plaintiff in error as to any earnings or guaranty of work. With this knowledge he proceeded to complete the agreement for the purchase of the truck, giving a written order, which is in evidence as Exhibit A, and executing Exhibit D. He used the truck a few days at Canon City, then came back to Denver and negotiated for a hydraulic hoist thereon at an additional cost of $907, and gave the usual written order therefor which is in evidence as Exhibit B. In both orders occurs the statement that the purchaser agrees the order contains the entire agreement relating to the sale. They have the usual printed warranty and state that "no person, agent, or dealer is authorized to give any other warranties on the company's behalf." It is to be noted that model No. 61 was not purchased because of any advertisement in the Denver Post, as was model No. 41, but because model No. 41 was too small and defendant in error wished a larger truck.

[2, 3] Considering the transaction as to the purchaser of model No. 61 as entirely separate and distinct from the purchase of model No. 41, it is apparent that before even entering into the contract for the purchase of model No. 61 defendant in error had full knowledge that the representations made by Hewitt, or Hewitt & Doss, were without authority and that he had no right to rely thereon. Assuredly a transaction is not subject to attack because of representations which the complaining party knew were made without authority, and upon which he did not rely when the transaction was entered into. Ming and Another v. Woolfolk, 116 U. S. 599, 6 S. Ct. 489, 29 L. Ed. 740; Miller v. Rush et al. (C. C. A.) 276 F. 641. The trial court took this view of the matter in that part of the instructions to the jury reading as follows:

"The court instructs you that, if you should find from the evidence that the agents of the defendant made certain false and fraudulent representations to the plaintiff, but that, before he took possession of the truck the so-called 61 truck, he was warned by the officials of the company of the Denver branch that such agents were not authorized to make any such promises or statements, and yet in the face of such information he went ahead, purchased, and took possession of the truck, then the court instructs you that the plaintiff was not deceived and cannot recover, and your verdict should be for the defendant."

This statement was a correct one, and that view of the case would under the undisputed evidence have warranted the court in instructing a verdict for plaintiff in error.

[4] Another theory, however, is presented in oral argument, and from parts of the court's instructions it is apparent the same was dominant in the trial of the case. That theory

is that, while defendant in error made a new agreement and turned in model No. 41 as part of the purchase price of model No. 61, he still relied on the representations as to No. 41, and that they helped to induce the purchase of No. 61. While the complaint filed is based on representations as to work at Canon City, and further work to be furnished thereafter, which the evidence shows was referred to only in the negotiations leading to the sale of model No. 61, and not model No. 41, nevertheless we fail to see how defendant in error's case is strengthened by including in the alleged false representations as to the purchase of model No. 61 the representations made as to model No. 41. This theory presents the situation of a party, knowing that representations which he relied on in making a purchase of a piece of property (model No. 41) were without authority, turning in without protest or complaint on his part such property, in part consideration for another piece of property (model No. 61) and making an entirely new arrangement. Certainly the alleged fraud was known before the contract for model No. 61 was completed. No attempt was made to rescind the contract as to model No. 41, and no action for deceit or fraud brought with relation thereto. Indeed, in the complaint it is alleged that defendant in error demanded the return to him of model No. 41. Defendant in error chose to go on with the transaction with full knowledge of the situation, using the property received as a part of the consideration in a new agreement for the purchase of model No. 61. He was advised by Mr. Jackson, as before pointed out, that Hewitt & Doss had no authority to promise any jobs; that if he took model No. 61 he did so with no promise of earnings or guaranty of work. Accepting the uncontradicted testimony of Mr. Jackson as true, the new agreement was a complete waiver and condonement of what defendant in error claims were fraudulent representations, inducing him to enter into the contract. Certainly he did not rely in said purchase on any of the representations made either as to model No. 41 or model No. 61. A defrauded party must act consistently or lose the right to complain. Clearly, under these circumstances, defendant in error is not in position to pursue an action for damages because of deceit and fraud in the purchase of No. 61. Either theory presented is fatal to defendant in error's claim under this record.

The books are replete with cases bearing on these questions. The propositions involved are so well settled that the citation of authorities would seem unnecessary. However, we refer to a few. Some bear on the question of rescission for fraud, but the language employed is enlightening on the subject of waiver of fraudulent representations.

In Kingman & Co. v. Stoddard et al., 85 F. 740, 745, 29 C. C. A. 413, 418, the court said: "The contract, being against conscience because of the fraud, is not obligatory upon him, if he shall so elect; but if, when fully informed of the fraud, he voluntarily confirms, ratifies, and performs and exacts performance of the contract, he condones the fraud, and such ratification, like the ratification of the unauthorized act of an agent, relates to the time of the contract, confirming it from its date and purging it of fraud. With respect to an executory contract, one may not, after knowledge of the fraud, continue to carry it out, exacting performance from the other party to it, receive its benefits, and still pursue an action for deceit; and this because continued execution with knowledge of the fraud signifies the ratification of a contract voidable for fraud, and condones the fraud. For example, if one by the imposition of fraudulent practices has been induced to purchase goods, and after their receipt discovers the fraud, he may rescind, or may affirm and have his action for the deceit. But if, before delivery of the goods, he has discovered the fraud, he may not then accept the goods, and still have an action for deceit. * * * With respect to an executory contract voidable by reason of fraud, the defrauded party, with knowledge of the deceit practiced upon him, may not play fast and loose. He cannot approbate and reprobate. He must deal with the contract and with the wrongdoer at arm's length. He may not, with knowledge of the fraud, speculate upon the advantages or disadvantages of the contract, receiving its benefits, and at the same time repudiate its obligations."

In Simon v. Goodyear Metallic Rubber Shoe Co., 105 F. 573, 579, 44 C. C. A. 612, 618 (52 L. R. A. 745) the court said: "This being the rule of damages in an action by one who has been fraudulently induced to make either a contract of sale or purchase, it must follow that if one, after full knowledge of the fraud and deceit by which he has been induced to make a sale of property, goes forward and executes it notwithstanding such fraud, the damage which he thereby sustains is voluntarily incurred. The maxim 'volenti non fit injuria' has application to all loss resulting from the voluntary execution of a nonobligatory contract with full knowledge of the facts which render it voidable. Fraud

without damage is not actionable. If the fraud be discovered while the contract is wholly executory, the party defrauded has the option of going on with it or not, as he chooses. If he executes it, the loss happens from such voluntary execution, and he cannot recover for a loss which he deliberately elected to incur."

In Western Electric Co. v. Hart, 103 Mich. 477, 482, 61 N. W. 867, 869, is language quite apropos to this case, as follows: "It appears conclusively that the defendant knew at the time he entered into the second contract all the facts that he claimed, on the trial, constituted the fraud. The representations were made before the second contract was entered into, and yet, with full knowledge that these representations were not true in fact, he entered into the second arrangement. By this new agreement he lost his right to complain of the prior transaction."

The Colorado courts announce the same doctrine in Ponder v. Altura Farms Co., 57 Colo. 519, 523, 524, 143 P. 570, 571, where the court said: "It is the settled rule that one who has been induced, through fraud to enter into a contract has the election either to rescind, tendering back that which he has received, or affirming the contract he may have his action for deceit to recover damages. But the affirmance so referred to can have relation only to the completed transaction, and that if he become advised of the fraud perpetrated upon him in time to recede from his agreement, and yet, when with knowledge of the falsity of the representations which has induced the contract, elects to perform, and clearly manifests his intention to abide by the contract, he condones the fraud and may not recover. * * * and this because continued execution with knowledge of the fraud, signifies the ratification of a contract voidable for fraud, and so condones the fraud." Other Colorado cases are Blanke Tea & Coffee Co. v. Sargent et al., 57 Colo. 299, 141 P. 468; Emerson-Brantingham Implement Co. v. Wood, 63 Colo. 130, 165 P. 263; Coffman et al. v. Hartman et al., 70 Colo. 231, 199 P. 480. See, also, Grymes v. Sanders et al., 93 U. S. 55, 23 L. Ed. 798; Fitzpatrick v. Flannagan, 106 U. S. 648, 1 S. Ct. 369, 27 L. Ed. 211; Farrar v. Churchill, 135 U. S. 609, 10 S. Ct. 771, 34 L. Ed. 246; McLean v. Clapp, 141 U. S. 429, 12 S. Ct. 29, 35 L. Ed. 804; Stuart v. Hayden et al., 72 F. 402, 18 C. C. A. 618; Richardson et al. v. Lowe et al., 149 F. 625, 79 C. C. A. 317; E. H. Taylor, Jr., & Sons, Inc., v. First Nat. Bank of Aurora, Ind., 212 F. 898, 129 C. C. A. 418; In re Tear-Off Bottle Seal Co.,

224 F. 492, 140 C. C. A. 200; Harris v. Egger, 226 F. 389, 141 C. C. A. 219; Miller v. Continental Ship Building Corporation (C. C. A.) 265 F. 158; First Nat. Bank of Kansas City, Mo., v. Seldomridge (C. C. A.) 271 F. 561; Champion Spark Plug Co. v. Automobile Sundries Co. (C. C. A.) 273 F. 74; Thompson v. Libby, 36 Minn. 287, 31 N. W. 52; Dailey v. King, 79 Mich. 568, 44 N. W. 959; McEacheran v. Western Transportation & Coal Co., 97 Mich. 479, 56 N. W. 860; 14 Am. & Eng. Enc. Law, 171.

[5] We are satisfied that the evidence presented by this record is of such conclusive character as to the waiver by defendant in error of the alleged fraudulent representations that the trial court in the exercise of a sound judicial discretion should not have sustained a verdict in opposition thereto. Consequently under the well-established doctrine of this and other courts it was error not to sustain the motion at the close of the testimony to direct a verdict for plaintiff in error. Bell v. Carter et al., 164 F. 417, 90 C. C. A. 555, 19 L. R. A. (N. S.) 833; Hart v. Northern Pac. Ry. Co., 196 F. 180, 116 C. C. A. 12; Agricultural Ins. Co. v. Higginbotham (C. C. A.) 274 F. 316; New Amsterdam Casualty Co. et al. v. Farmers' Co-op. Union of Lyons, Kan. (C. C. A.) 2 F.(2d) 214; Southern Pacific Co. v. Pool, 160 U. S. 438, 16 S. Ct. 338, 40 L. Ed. 485. The case is reversed and remanded for proceedings in harmony with this opinion.

Reversed.